UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SCARLOTTE A. PASHIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:16 CV 1267 ACL |
| | ) | |
| NANCY A. BERRYHILL,[1] | ) | |
| | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Plaintiff Scarlotte A. Pashia brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of her application for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act.

An Administrative Law Judge ("ALJ") found that, despite Pashia's severe physical and mental impairments, she was not disabled as she had the residual functional capacity ("RFC") to perform jobs that exist in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be reversed and remanded.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

# I. Procedural History

Pashia filed an application for benefits under Title II on February 1, 2013, claiming that she became unable to work on January 31, 2013, because of bipolar disorder, seizures, depression, diabetic neuropathy, right knee problems, diabetes, and high blood pressure.   (Tr. 158-64, 209.) Pashia's claim was denied initially.   (Tr. 99-103.)   Following an administrative hearing, Pashia's claim was denied in a written opinion by an ALJ, dated March 16, 2015.   (Tr. 15-28.) Pashia then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on June 3, 2016.   (Tr. 1-5.)   Thus, the decision of the ALJ stands as the final decision of the Commissioner.   *See* 20 C.F.R. §§ 404.981, 416.1481.

In the instant action, Pashia argues that the ALJ "failed to properly weigh the medical evidence and failed to properly determine Ms. Pashia's mental residual functional capacity." (Doc. 9 at 9.)   Pashia next contends that the ALJ "failed to properly evaluate Ms. Pashia's credibility."   *Id.* at 13.   Finally, she argues that the ALJ "relied on flawed vocational expert testimony."   *Id.* at 15.

# II. The ALJ's Determination

The ALJ found that Pashia meets the insured status requirements of the Social Security Act through December 31, 2017, and has not engaged in substantial gainful activity since her alleged onset date of January 31, 2013.   (Tr. 17.)

In addition, the ALJ concluded that Pashia had the following severe impairments: obesity, diabetes mellitus, peripheral neuropathy, osteoarthritis of the right knee, chondromalacia in both knees, and bipolar disorder.   *Id.*   The ALJ found that Pashia did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed

impairments.   (Tr. 18.)

As to Pashia's RFC, the ALJ stated:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a), except the claimant can perform no climbing of stairs, ladders, ropes, or scaffolds, cannot perform work at unprotected heights, can endure no concentrated exposure to hazards of machinery in the workplace, and can have no more than rare contact with the public or coworkers.   The claimant is limited to no more than occasional changes in the workplace routine.

(Tr. 20.)

The ALJ found that Pashia's allegations regarding the extent of her limitations were not credible.   (Tr. 26.)   In determining Pashia's mental RFC, the ALJ indicated that she was assigning "little weight" to the opinions of treating psychiatrist Heather Hill, M.D.   (Tr. 25-26.)

The ALJ further found that Pashia was unable to perform past relevant work, but was capable of performing other jobs existing in the national economy, such as patcher, and touch-up screener.   (Tr. 27.)   The ALJ therefore concluded that Pashia has not been under a disability, as defined in the Social Security Act, from January 31, 2013, through the date of the decision.   (Tr. 28.)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits protectively filed on February 1, 2013, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

*Id.*

# III.   Applicable Law

## III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion.   *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."   *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."   *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.   Any corroboration by third parties of the plaintiff's impairments.

6.   The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted). *See also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

**III.B.  Determination of Disability**

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any other kind of substantial gainful work which exists … in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the

regulations.   20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   First, the Commissioner will consider a claimant's work activity.   If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.   20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities."   *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003).   "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."   *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."   20 C.F.R. § 416.921(b).   These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.   *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).   "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work."   *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment.   If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience.   20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley*

*v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §

416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. *See* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. *See id.* Next, the Commissioner must determine the severity of the impairment based on those ratings. *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. *See id.* If there is a severe impairment, but the impairment does

not meet or equal the listings, then the Commissioner must prepare an RFC assessment. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

## IV.  Discussion

As an initial matter, the undersigned notes that Pashia does not challenge the ALJ's findings as to her physical impairments.  As such, the Court's discussion will be limited to the evidence and findings regarding Pashia's mental impairments.  The undersigned will first consider the ALJ's credibility determination, as the ALJ's evaluation of Pashia's credibility was essential to her determination of other issues.

### 1.        Credibility Analysis

As a general matter, credibility determinations "are the province of the ALJ, and as long as 'good reasons and substantial evidence' support the ALJ's evaluation of credibility," the Court will defer to the ALJ's decision. *See Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (quoting *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)).  Furthermore, an ALJ "may decline to credit a claimant's subjective complaints 'if the evidence as a whole is inconsistent with the claimant's testimony.'"  *Julin*, 826 F.3d at 1086 (quoting *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006)).  In evaluating Plaintiff's credibility regarding the extent of her symptoms, the ALJ must consider all of the evidence, including objective medical evidence, and evidence relating to the factors enumerated in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984), including: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of Plaintiff's pain; (3) precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) Plaintiff's functional restrictions.  *See Julin*, 826 F.3d at 1086; *see also* 20 C.F.R. §§ 404.1529, 416.929(c).  The ALJ does not need to discuss each factor separately; rather, the court will review the record as a whole to ensure relevant evidence was not disregarded by the ALJ.

*See McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011); *see also Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001) ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth.").

Pashia argues that the ALJ found her allegations regarding her mental impairments not credible only because she was not always compliant with treatment and because there was a lack of evidence that she attempted to seek free or low cost treatment.

The ALJ made the following determination regarding Pashia's credibility:

> The records indicate the claimant has been non-compliant with the medications prescribed for her mental and her physical impairments. The records indicate the claimant states she is unable to afford medication and treatment. The medical records, however, do not document that the claimant was ever refused treatment or medication for any reason, including insufficient funds. The records do not indicate the claimant sought the aid of any and all possibly available public or private institution, program, or individual, to help defray the cost of treatment. The records do not show the claimant discussed alternative methods of payment with her treating physicians. Thus, I find not convincing the claimant's assertions of a lack of financial resources as a reason for failing to consistently take her prescribed medications.

(Tr. 26.)

A claimant's failure to seek treatment from a mental health professional is a relevant consideration when evaluating a claimant's mental impairment. *See Partee v. Astrue*, 638 F.3d 860, 864 (8th Cir. 2011). Although an inability to pay may justify a claimant's failure to seek medical care, a claimant must present evidence that her failure to seek treatment was due to the expense. *See, e.g. Riggins v. Apfel,* 177 F.3d 689, 693 (8th Cir. 1999) (ALJ appropriately discounted claimant's argument he could not afford medical care absent evidence he sought and was denied low-cost or free care); *Johnson v. Bowen,* 866 F.2d 274, 275 (8th Cir. 1989) (although lack of funds may sometimes justify failure to seek medical care, there was no evidence plaintiff had told his physicians he could not afford the prescription at issue and was denied the

medication).

In this case, the record is replete with references to Pashia's inability to afford treatment and medications. At the administrative hearing, Pashia testified that she took her medications when she could get them. (Tr. 52.) She stated, "I can't afford the medicine at times and so when I don't have the medicine, I don't take it." (Tr. 53.) Pashia further testified that her doctor gives her samples "when she can," and has given her cards to enable her to obtain her medications at a lower cost. *Id.*

The medical record also supports Pashia's allegations regarding her inability to afford medications. In a treatment note dated April 16, 2012, treating primary care physician Kristi A. Moore, D.O. noted that Pashia was not taking medications at that time. (Tr. 404.) Dr. Moore stated that Pashia had seen a physiatrist, who suggested she start Ativan,[2] but Pashia reported "that it was too expensive and that [the psychiatrist] likely won't see her again." *Id.* In June 2012, Dr. Moore noted that Pashia's psychiatrist had prescribed a new psychotropic medication, and that Dr. Moore had given Pashia samples of the medication. (Tr. 401.) Dr. Moore stated that she encouraged Pashia to follow up with her psychiatrist, "however her financial situation makes it difficult per pt." *Id.* In June 2013, treating psychiatrist Dr. Hill noted that Pashia could not afford her medications. (Tr. 431.) She provided Pashia with "resources for low cost clinics." *Id.* Dr. Hill provided an opinion regarding Pashia's mental limitations on July 12, 2013, in which she noted that Pashia received treatment "less than recommended due to patient's inability to afford treatment" (Tr. 508) and that Pashia took less than the recommended dosage of Haldol[3] due

---

[2]  Ativan is indicated for the treatment of anxiety. *See* WebMD, http://www.webmd.com/drugs (last visited September 25, 2017).

[3]  Haldol is an antipsychotic drug indicated for the treatment of mental disorders such as schizophrenia. *See* WebMD, http://www.webmd.com/drugs (last visited September 25, 2017).

to her inability to afford the medication (Tr. 513).   In a letter dated January 30, 2014, Dr. Hill stated that Pashia was "unable to afford most of her medications for her medical and psychiatric illnesses, which causes her to have a poor prognosis."   (Tr. 560.)   Dr. Hill again pointed out Pashia's financial obstacles to care in a letter dated January 30, 2015:

> [T]he frequency of her treatment is less than recommended due to her inability to afford treatment...She is skeptical or mistrusting of the healthcare system and due to financial limitations—she has not been able to afford recommended treatment—her prognosis is guarded.

(Tr. 583.)   With regard to mistrust of the healthcare system, noncompliance issues are common with those who suffer from mental illness.   "[F]ederal courts have recognized a mentally ill person's noncompliance…can be, and usually is, "the result of [the mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse." *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (citations omitted).

Pashia's inability to receive medications and treatment due to financial limitations is well documented in the medical record.   (Tr. 52, 53, 394, 401, 404, 431, 434-39, 508, 513, 535, 556, 560, 583.)   The record also reveals that, contrary to the ALJ's assertion, Pashia did seek and avail herself of free or low cost treatment options.   (Tr. 390, 394, 401, 431, 435, 439, 441.)   Pashia also reported that her first psychiatrist would likely not see her again as the medications he prescribed were too expensive.   (Tr. 404.)   Dr. Hill repeatedly attributed Pashia's infrequent treatment and medication noncompliance to her lack of financial resources.   The ALJ's finding that Pashia was not credible in asserting that her noncompliance was due to an inability to pay is not supported by the record.

The undersigned notes that the ALJ also found that Pashia was noncompliant with the diet and exercise recommended to treat her diabetes, and that this noncompliance was not caused by her financial situation.   (Tr. 26.)   This finding is supported by the record, as Pashia admitted at

the hearing that she did not follow her prescribed diabetic diet because she was "addicted to food." (Tr. 53.)   While the ALJ properly found that this noncompliance detracted from Pashia's complaints of disabling diabetes, this is not a sufficient basis to discredit Pashia's complaints of mental limitations in light of the record discussed above.

Further, the ALJ did not discuss any of the other *Polaski* factors.   As Pashia correctly points out, the ALJ did not discuss Pashia's good work history, which weighs in favor of her credibility.   Specifically, Pashia notes that she had sustained earnings every year for over twenty years prior to the time she became disabled.   *See Finch v. Astrue,* 547 F.3d 933, 936 (8th Cir. 2008) (unbroken earnings record from 1961 to 1999 weighed in favor of claimant's credibility). The ALJ also did not discuss Pashia's daily activities, such as her testimony that she stays in bed all day, and gets up every two to three hours to eat.   (Tr. 60.)

The undersigned finds that the ALJ did not provide "good reasons" for discrediting Pashia's subjective allegations regarding her mental impairments.   As will be discussed in detail below, Pashia has an extensive history of mental health treatment, including two inpatient hospitalizations and an emergency room visit due to suicidal ideations.   The ALJ based her credibility determination primarily upon Pashia's lack of treatment and noncompliance with medication.   The ALJ mischaracterized the evidence in finding that Pashia's noncompliance with treatment recommendations was not caused by her lack of financial resources.   The ALJ's credibility analysis is also incomplete, as it does not address other *Polaski* factors, including those weighing in favor of Pashia's credibility.

Thus, the ALJ's credibility assessment is not based on substantial evidence.

2.     **Medical Opinion Evidence and RFC**

Pashia also contends that the ALJ erred in discounting the opinions of treating psychiatrist

Dr. Hill, and in failing to indicate what weight, if any, she assigned to the other medical evidence in the record. Pashia argues that these errors resulted in an RFC determination that is not supported by the medical evidence.

Dr. Hill provided several opinions regarding the severity of Pashia's mental impairments and their effect on her ability to work. On July 12, 2013, Dr. Hill completed a "Psychiatric/ Psychological Impairment Questionnaire." (Tr. 508-15.) Dr. Hill listed Pashia's diagnoses as: bipolar disorder/psychotic disorder; and suspect schizoaffective disorder and PTSD. (Tr. 508.) Pashia's current GAF score was 47,[4] with the lowest GAF score in the past year of 20.[5] *Id.* Dr. Hill identified the following clinical findings: appetite disturbance with weight gain; sleep disturbance; mood disturbance; emotional lability; oddities of thought, perception, speech or behavior; perceptual disturbances; social withdrawal or isolation; decreased energy; recurrent panic attacks; anhedonia or pervasive loss of interests; intrusive recollections of a traumatic experience; psychomotor agitation or retardation; paranoia or inappropriate suspiciousness; feelings of guilt/worthlessness; hostility and irritability; and suicidal ideation or attempts. (Tr. 509.) Pashia's most frequent and severe symptoms were depression, irritability, and paranoia. (Tr. 510.) Pashia required hospitalization for her symptoms multiple times in 2011, December 2011 through January 2012, and in May 2012. *Id.* Dr. Hill expressed the opinion that Pashia was markedly limited in the following abilities: work in coordination with or proximity to others

---

[4] A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders* 34 (Text Revision 4th ed. 2000) ("DSM IV-TR").

[5] A GAF score of 11 to 20 indicates some danger of hurting self or others (*e.g*., suicide attempts without clear expectation of death, frequently violent, manic excitement); occasionally fails to maintain minimal personal hygiene (*e.g*., smears feces); or gross impairment in communication (*e.g*., largely incoherent or mute). *See DSM-IV-TR* at 34.

without being distracted by them; complete a normal workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and travel to unfamiliar places or use public transportation. (Tr. 513-14.) Dr. Hill found that Pashia was moderately limited in her ability to understand and remember detailed instructions; maintain attention and concentration for extended periods; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and set realistic goals or make plans independently. *Id.* Dr. Hill stated that Pashia experiences episodes of increased mood lability and irritability, which have caused her to lose jobs[6] in the past. (Tr. 513.) She also noted that Pashia is paranoid of people. *Id.* Dr. Hill indicated that Pashia was capable of low work stress, and noted that she was guarded, paranoid, irritable, and had a low frustration tolerance. (Tr. 514.) Finally, Dr. Hill found that Pashia was likely to be absent from work two to three times a month as a result of her impairments. (Tr. 515.)

In a letter dated January 30, 2014, Dr. Hill stated that Pashia has bipolar disorder with psychotic features, and is "unable to obtain work or maintain work, having lost several jobs due to her psychiatric illness." (Tr. 560.) She stated that Pashia is unable to afford most of her

---

[6] The undersigned notes that only one job loss was identified in the record, which was when Pashia was laid off from Air Link Communications in January 2013. Pashia testified that the president of the company told her they were downsizing. (Tr. 45.) She later testified that she "had communication issues with the employees of the company" as she "was in charge of reviewing their sales. . .if. . .all the paperwork wasn't there, [she] had the responsibility of removing the sale . . .from their commission. . ." (Tr. 63.) Pashia indicated she'd been reprimanded for verbal confrontations with coworkers. (Tr. 63-64.) She held the job for more than five years. While working at that job she received a promotion, however, the stress related to the promotion was too significant and Pashia was demoted. Prior to the Air Link job, Pashia reported a gap in employment from June 2006 through April 2007. (Tr. 210.)

medications, which causes her to have a poor prognosis.  *Id.*  Dr. Hill expressed the opinion that Pashia's "psychiatric illness is disabling and is chronic."  *Id.*

Finally, Dr. Hill authored a letter on January 30, 2015, reaffirming that the opinions she provided in July 2013 and January 2014 "remain valid and accurate to date."  (Tr. 583.)

The ALJ addressed Dr. Hill's opinions as follows:

> I give little weight to the opinion of psychiatrist Heather Hill, M.D.   While she is a treating physician in this case, Dr. Hill's opinions [] are not consistent with the record as a whole, including her own treatment records.

(Tr. 25.)

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians."  *Tindell v. Barnhart,* 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting *Vandenboom v. Barnhart,* 421 F.3d 745, 749-50 (8th Cir. 2005) (internal marks omitted)).   The opinion of a treating physician will be given "controlling weight" only if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  *Prosch v. Apfel,* 201 F.3d 1010, 1012-13 (8th Cir. 2000). The record, though, should be "evaluated as a whole."  *Id.* at 1013 (quoting *Bentley v. Shalala,* 52 F.3d 784, 785-86 (8th Cir. 1997)).   The ALJ is not required to rely on one doctor's opinion entirely or choose between the opinions.  *Martise v. Astrue,* 641 F.3d 909, 927 (8th Cir. 2011). Additionally, when a physician's records provide no elaboration and are "conclusory checkbox" forms, the opinion can be of little evidentiary value.  *See Anderson v. Astrue,* 696 F.3d 790, 794 (8th Cir. 2012).   Regardless of the decision the ALJ must still provide "good reasons" for the weight assigned the treating physician's opinion.   20 C.F.R § 404.1527(d)(2).

The ALJ must weigh each opinion by considering the following factors: the examining and treatment relationship between the claimant and the medical source, the length of the treatment

relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the physician provides support for his findings, whether other evidence in the record is consistent with the physician's findings, and the physician's area of specialty. 20 C.F.R. §§ 404.1527(c)(1)-(5), 416 .927(c)(1)-(5).

The ALJ's decision to discount Dr. Hill's opinions regarding the severity of Pashia's mental impairments is not supported by substantial evidence on the record as a whole. The ALJ made the conclusory statement that Dr. Hill's opinions were inconsistent with "the record as a whole, including her own treatment records," yet cites no specific inconsistencies.

First, Dr. Hill provided detailed narrative explanations of her opinions and cited specific signs and symptoms in support. She listed the following clinical findings upon which her opinions were based: sleep and mood disturbance; emotional lability; oddities of thought, perception, speech or behavior; perceptual disturbances; social withdrawal or isolation; recurrent panic attacks; anhedonia or pervasive loss of interests; intrusive recollections of a traumatic experience; psychomotor agitation or retardation; paranoia or inappropriate suspiciousness; feelings of guilt/worthlessness; hostility and irritability; and suicidal ideation or attempts. (Tr. 509, 583.) Dr. Hill provided additional information to explain her opinions, such as her statement that Pashia experiences episodes of increased mood lability and irritability, which have caused her to lose jobs in the past (Tr. 513); and that Pashia's ability to tolerate work stress was decreased because she was guarded, paranoid, irritable, and had a low frustration tolerance (Tr. 514). As previously noted, she also explained that Pashia's lack of more regular treatment was caused by her financial difficulties.

Second, Dr. Hill's treatment notes provide support for her opinions. Pashia first presented to Dr. Hill on May 22, 2012. (Tr. 389-90.) Pashia reported that "the hospital sent me." (Tr.

389.)   She had been hospitalized at Mercy Hospital from May 10, 2012, through May 18, 2012,

after presenting to the emergency room with suicidal ideation and reports of a suicide attempt by

hanging.   (Tr. 283.)   Pashia reported increased stress, depression, anxiety, and psychosis, and

would not sign a "contract for life" despite multiple suicide attempts.   (Tr. 389.)   Upon mental

status examination, Pashia's general appearance was guarded, her mood was depressed, her affect

was depressed and anxious, she exhibited some circumstantial thought, she had auditory

hallucinations, and her insight and judgment were fair.   *Id.*   Dr. Hill diagnosed Pashia with

bipolar disorder by history, suspect PTSD, Cluster B characteristics, and a GAF score of 45-50.

(Tr. 390.)   She prescribed Topamax,[7] Abilify,[8] and Zoloft.[9]   *Id.*   On May 25, 2012, Dr. Hill

substituted Prozac[10] for the Abilify and Zoloft because Pashia called to report she could not afford

those medications.   (Tr. 438.)   On May 30, 2012, Pashia called Dr. Hill's office requesting "a

medication that works immediately to calm her temper because she thinks she may end up losing

her job."   (Tr. 437.)   Dr. Hill prescribed Ativan.   *Id.*   On June 15, 2012, Pashia reported that

work was stressful so she didn't go to work for two days, and she had problems with rage.   (Tr.

391.)   On mental status examination, Pashia's mood was depressed and irritable, her affect was

depressed, and her memory, judgment, and insight were fair.   *Id.*   Dr. Hill diagnosed her with

---

[7]   Topamax is an anticonvulsant indicated for the treatment of seizures and migraine headaches.
*See* WebMD, http://www.webmd.com/drugs (last visited September 25, 2017).

[8]   Abilify is an antipsychotic drug indicated for the treatment of bipolar disorder, schizophrenia,
and depression.   *See* WebMD, http://www.webmd.com/drugs (last visited September 25, 2017).

[9]   Zoloft is indicated for the treatment of depression and anxiety.   *See* WebMD,
http://www.webmd.com/drugs (last visited September 25, 2017).

[10]   Prozac is indicated for the treatment of depression.   *See* WebMD,
http://www.webmd.com/drugs (last visited September 25, 2017).

bipolar disorder with irritability.  *Id.*  She gave Pashia samples of Viibryd,[11] and prescribed

Haldol.  *Id.*  On September 6, 2012, Pashia reported that she was "still irritable but less so" and

"others comment that she is still abrasive."  (Tr. 392.)  Dr. Hill noted irritability on examination,

and continued Pashia's medications.  *Id.*  On September 20, 2012, Pashia reported that her

medications were not controlling her symptoms, her depression and anxiety had increased, she was

tearful at work, and she had no motivation.  (Tr. 433.)  Dr. Hill prescribed Xanax.[12]  (Tr. 432.)

Pashia's next visit with Dr. Hill was not until nine months later on June 16, 2013, at which time she

reported she had lost her job in January and was unable to afford her medications.  (Tr. 431.)

Upon mental status examination, Pashia was sad, anxious, and angry.  *Id.*  Dr. Hill diagnosed

Pashia with bipolar depression versus schizoaffective disorder, generalized anxiety disorder,

possible PTSD, and a GAF score of 47.  *Id.*  She prescribed Haldol and gave Pashia information

on low cost clinics.  *Id.*  On October 24, 2013, Pashia reported that her medications were not

relieving her symptoms.  (Tr. 557.)  She complained of high anxiety, irritability, and insomnia.

*Id.*  Upon examination, Dr. Hill noted slow movements; a sad, anxious, and angry affect; and fair

insight and judgment.  *Id.*  Dr. Hill prescribed Haldol and Xanax.  *Id.*  On January 13, 2014,

Pashia reported that she was irritable and depressed, and was no better.  (Tr. 569.)  On

examination, Dr. Hill noted Pashia's speech was decreased, her mood was sad, her affect was flat,

her fund of knowledge was fair, and her attention and concentration were fair.  *Id.*  Dr. Hill noted

that Pashia was not receiving needed therapy because she could not afford it.  *Id.*  On April 24,

2014, Pashia again reported that her medications were not effective.  (Tr. 566.)  Dr. Hill noted a

---

[11]  Viibryd is indicated for the treatment of depression.  *See* WebMD,
http://www.webmd.com/drugs (last visited September 25, 2017).

[12]  Xanax is indicated for the treatment of anxiety and panic disorders.  *See* WebMD,
http://www.webmd.com/drugs (last visited September 25, 2017).

sad mood, flat affect, and fair insight and judgment on examination.   *Id.*   Dr. Hill re-started

Pashia on Haldol.   *Id.*

Dr. Hill's treatment notes summarized above reveal consistent findings of depressed,

anxious, and irritable mood; fair insight and judgment; and occasional psychotic symptoms on

mental status examination.   They demonstrate that Pashia's symptoms were not controlled with

medication.   Dr. Hill's treatment notes also document Pashia's problems in the work place due to

her psychiatric symptoms.

Third, the other medical evidence of record is supportive of Dr. Hill's opinions.   Pashia

sought emergency treatment on multiple occasions prior to her alleged onset of disability date due

to suicidal ideations.   She was admitted at Mercy Hospital from December 30, 2011, through

January 6, 2012, after she reported taking too many Xanax the day prior in a suicide attempt.   (Tr.

253.)   On March 30, 2012, Dr. Moore believed that Pashia "need[ed] inpatient monitoring due to

seriousness and recurrence of [suicidal] thoughts."   (Tr. 407, *see also* Tr. 338.)   When Pashia

arrived at the emergency room, she had passive thoughts of suicide and exhibited anger and

impulsivity.   (Tr. 342.)   Six weeks later, on May 10, 2012, Pashia was admitted to the hospital

after trying to hang herself.   (Tr. 283.)   While in the hospital, Pashia reported that she "tried to

hurt [her]self every day for 2 weeks" and "[n]othing is working and I don't die."   (Tr. 290.)   She

also stated that she "want[ed] to eat herself into oblivion but also indicate[d] 15 lb weight loss in

past week."   *Id*.   She was hospitalized for eight days.   Absent from the record is documentation

related to Pashia's hospitalizations twice in June 2011 and once in November 2011.   (Tr. 215.)

On January 31, 2013, Pashia's primary care physician, Dr. Moore, diagnosed her with bipolar

disorder and noted that Pashia was terminated from her job on that date.   (Tr. 394.)   Pashia felt

she was terminated due to the "harsh communications with people beneath her," and reported that

she had been told she "scares people."  *Id.*   The other medical evidence of record, therefore, supports the presence of significant psychiatric symptomatology affecting Pashia's ability to function in the workplace.   Furthermore, Pashia testified that she had been reprimanded at her most recent job for inappropriate verbal confrontations with co-workers.   (Tr. 64.)   Pashia explained that she can't "express [her]self in a friendly manner."  *Id*.

The only other mental health provider who provided an opinion regarding Pashia's mental limitations was consultative psychologist Kirmach Natani, Ph.D.   Pashia saw Dr. Natani for a psychological examination at the request of the State agency on August 19, 2013.   Pashia reported that she was depressed all the time, had sleep problems, and had no self-worth.  (Tr. 492.)   Pashia was chronically irritable and angry because her father sexually abused her and her family would not accept this fact.  *Id.*   She had been hospitalized for suicidal ideation six times related to her anger with her family.  *I*d.   Pashia had a history of suicide attempts via cutting, hanging, and prescription overdose.  *Id.*   Pashia also had experienced problems at work related to her anger, and reported that her attitude caused her to lose jobs.[13]  *Id.*   Upon examination, Dr. Natani noted Pashia's mood was depressed, and her affect was irritable.  (Tr. 493.)   Pashia was focused on her frustration with not being able to find some real relief for her problems.  *Id.*   As to her activities of daily living, Pashia lived with her husband and did not cook or do household chores, did not shop for groceries, and never engaged in fun activities; she reported only going to church and going out to eat.  (Tr. 494.)   She had no friends and socialized only with her husband.  *Id.*   Dr. Natani noted no problems with concentration, persistence or pace during the interview.  *Id.*   Dr. Natani diagnosed Pashia with PTSD, dysthymic disorder, anxiety disorder, borderline personality

---

[13]   Once again, the undersigned notes that the only job loss identified in the record is when Pashia was laid off from Air Link Communications in January 2013.   *See* fn 6, *supra*.

disorder, and a GAF score of 52.[14]   (Tr. 494-95.)   Her prognosis was poor.   (Tr. 495.)   Dr.

Natani expressed the opinion that Pasha had moderate limitations in her ability to interact

appropriately with the public, supervisors, and co-workers; and in her ability to respond

appropriately to usual work situations and to changes in a routine work setting.   (Tr. 497.)   In

support of her opinions, Dr. Natani noted that Pashia "has severe depression, PTSD and a

personality disorder.   Her stress tolerance is low and her behavior is unpredictable under stress."

*Id.*   The ALJ failed to indicate the weight she assigned to Dr. Natani's opinions.   "As a general

matter, the report of a consulting physician who examined a claimant once does not constitute

substantial evidence upon the record as a whole, especially when contradicted by the evaluation of

the claimant's treating physician."   *Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007).

The undersigned finds that the ALJ did not provide sufficient reasons to discredit Dr. Hill's

opinions.   Dr. Hill was the only treating mental health provider to provide an opinion regarding

Pashia's mental limitations.   Given Dr. Hill's specialized field of practice and the length and

nature of her treatment history with Pashia, she was in the best position to render an opinion as to

Pashia's limitations.   Dr. Hill also provided sufficient findings in support of her opinions, and her

treatment notes lend further support.   The ALJ failed to point to any inconsistencies in the other

medical evidence, nor did she indicate the weight assigned to the other medical opinions.

A claimant's RFC determination is "based on all the evidence in the record, including 'the

medical records, observations of treating physicians and others, and an individual's own

description of his limitations.'"   *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002)

(quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).   Although an ALJ may consider

---

[14]   A GAF score of 51 to 60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."   *See DSM IV-TR* at 34.

non-medical evidence in making the RFC determination, it still must be supported by at least some medical evidence.   *See Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001).

The ALJ cited no medical evidence in support of her mental RFC determination.   Rather, the ALJ only discussed Pashia's noncompliance with treatment recommendations and discredited Dr. Hill's opinions.   The Court has already found that the ALJ erred in making these findings. Thus, the ALJ's RFC determination is not supported by substantial evidence.   The Court need not discuss Pashia's additional argument that the ALJ erred at step five.

## Conclusion

The ALJ erred in assessing Pashia's credibility, weighing the medical opinion evidence, and determining Pashia's mental RFC.   Because the ALJ's opinion finding Pashia not disabled is not supported by substantial evidence on the record as a whole, it is reversed and this matter is remanded for further proceedings consistent with this opinion.   Upon remand, the ALJ shall perform a complete credibility analysis, weigh the medical opinion evidence, and formulate a new mental RFC based on the record as a whole.

ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of September, 2017.